## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Civil No. _11·629  DSD/JJG_

InCompass IT, Inc.,

        Plaintiff,

        **COMPLAINT**

v.

Dell Inc.,

        **JURY TRIAL DEMANDED**

        Defendant.

As and for its jury demand and complaint against Dell Inc. ("Dell"), InCompass IT, Inc., ("InCompass") states and alleges as follows:

### PARTIES

1.   At all relevant times, Minnesota citizen InCompass, a Minnesota corporation with headquarters and a data center at 300 2nd Street NW, New Brighton, MN 55112, was, and still is, a provider of managed IT services ("MSP") through a combination of managing, monitoring and collocating servers and IT infrastructure as well as providing hosted applications and desktops through its cloud services for non-profits, healthcare, small-to-medium sized businesses generally, and IT value-added resellers ("VARs").

2.   At all relevant times, Delaware citizen Dell Inc. was, and still is, a Delaware corporation with its principal place of business in Texas at 1 Dell Way, Round Rock, TX 78682.   Dell designs, develops, manufactures, markets, sells, and supports information technology equipment and related services worldwide.

SCANNED

MAR 1 1 2011

U.S. DISTRICT COURT MPLS

3.    Service of process on Dell will be made by delivering a copy of the Summons and Complaint to Dell's registered agent for service of process in Delaware (Corporation Service Company, 2711 Centerville Road - Suite 400, Wilmington, DE 19808) pursuant to Fed. R. Civ. P. 4(h)(1)(B).

## JURISDICTION AND VENUE

4.    Because this action arises between citizens of different States and the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs, this court has jurisdiction over all of the claims set forth in this Complaint 28 U.S.C. § 1332(a).

5.    This court has supplemental jurisdiction over plaintiff's state and common law claims by virtue of the provisions of 28 U.S.C. § 1367(a) because those claims form part of the same case or controversy under Article III of the United States Constitution.

6.    Defendant Dell shall properly be deemed to reside in this judicial district pursuant to 28 U.S.C. § 1391(c) and Minn. Stat. § 543.19 because it is subject to personal jurisdiction in this judicial district by virtue of its contacts with this judicial district, because, directly or through its subsidiaries, affiliates, or agents, it has transacted business in Minnesota, because it obtained the benefits of the law of Minnesota and the Minnesota market for its products, because it committed acts outside Minnesota causing injury in Minnesota, and because it committed acts in Minnesota causing injury in Minnesota.

7.    Dell conducts and transacts business with, or contracts to supply goods or services to, customers located in Minnesota and in this district, both through a sales representative located in Minnesota and over the Internet using its interactive website,

located at http://www.dell.com, and Dell further conduct and transact business in this district by targeting their advertising of their goods and services to individuals or entities located in Minnesota using direct mail and their Internet website.

8.     Venue is proper in this district under 28 U.S.C. § 1391(a)(2) because a substantial part of the events or omissions giving rise to InCompass' causes of action occurred in this judicial district.

## FACTUAL BACKGROUND

9.     On March 3, 2008, Dell entered into a Reciprocal Non Disclosure Agreement ("NDA") with InCompass which obligated Dell to not disclose or use for its own benefit any confidential information disclosed in   "[d]iscussions regarding  various potential business relationship opportunities, including InCompass's invention for monitoring servers and devices that saves energy for IT infrastructures" (hereinafter the "InCompass Technology").   *See* Exhibit A, attached hereto and incorporated by reference.

10.  The NDA defined confidential information as follows:

> (a)  Confidential Information shall mean any acceptable information or materials that one Party (the "Disclosing Party") specifically marks and designates as confidential to the other party (the "Recipient Party") either orally or in writing, or which under the circumstances surrounding the disclosure, should be treated as confidential.  Confidential Information includes, but is not limited to, information or materials regarding a Party's products, customers, marketing plans, finances, business policies and practices, and other information of a confidential nature. Confidential Information shall also include, but not be limited to, all tangible materials containing Confidential Information such as drawings, schematics, written or printed documents, and computer disks and tapes, whether machine readable or user readable.

Exhibit A, § 1 (Definition of Confidential Information).

11.  The NDA put the following restrictions on the use of confidential

information disclosed by one party to the other:

> (a)  Recipient Party shall not disclose any Confidential Information to third parties for a period of three (3) years from the Effective Date of this Agreement. Notwithstanding the foregoing, Recipient Party may share Confidential Information with Recipient Party's employees and contractors who have a need to know the Confidential Information, provided that such employees and contractors are bound by agreement with Recipient Party to protect this type of information. Recipient Party shall advise all employees and contractors given access to Confidential Information that they must maintain its confidentiality and otherwise comply with the terms and conditions of this Agreement.
>
> (b)  Recipient Party shall use the Confidential Information only for the purposes expressly contemplated by the Project described above.

Exhibit A, § 2 (Restrictions on Use of Confidential Information).

12.  On information and belief, Dell's CEO, Michael Dell, established Dell on the concept that it would sell them directly to customers via the telephone and the internet instead of going through retail stores or resellers. Dell cut out the middleman, also known as VARs, MSPs, and retail outlets, and instead dealt with the public and businesses directly. Dell did allow some VARs to resell its IT equipment, but it was an unofficial program with nothing more than tax-exempt status. Dell's major competitors sold most of their products through VARs, MSPs and retail outlets.

13.  There are thousands of VARs, MSPs and retail outlets, the common name for the group being channel. A single VAR, MSP or retail outlet in the channel is known as a channel partner. The manufacturers that sold their equipment through a channel created official channel partner programs that provided partners with marketing funds, marketing training, pre-sales support and post-sales support. Most have a registration process that enables channel partners to get special lower pricing as well as some

protection from other channel partners or direct sales teams selling to the registered channel partners' prospects or clients, a practice known as poaching.

14. Through 2005 and in competition with the largest IT equipment manufacturers and their channel partners, Dell's direct methodology became their corporate culture and was a contributing factor enabling Dell to become the largest PC manufacturer in the world.

15. In 2006 and on information and belief, Dell for the first time since the 1980s started to grow slower than the market. Hewlett-Packard overtook Dell as the largest PC manufacturer by mid-year.

16. By January 2007 when Michael Dell replaced Kevin Rollins as CEO, Dell was losing significant market share to those manufacturers who worked with the channel instead of against it.

17. In early 2007, Dell sent out a memo to employees stating "[t]he direct model was a revolution. It's not a religion." Facing declining market share and rampant reports of poor customer service and support, Dell announced that it would create an official partner program that would include marketing, price breaks and protection of registered deals from other VARs and Dell's direct sales team.

18. In late 2007, Dell announced an official channel partner program named "Dell Partner Direct". It promised VARs and MSPs who joined the program would have increased discounts on product, protection from Dell's direct sales team, and the ability to use the Dell name and logo in their marketing.

19. InCompass had been an unofficial reseller of Dell products for seven years when InCompass' CEO Tim Lambrecht traveled to Texas in February 2008 to speak at the Channel Summit 2008 conference to educate others about the waste of IT energy.

Lambrecht spoke on the energy topic Energy in IT called, "Going Green, Who's Doing it and Why."

20.  While there, Lambrecht had occasion to speak with many attendees, one of whom was channel account manager Casey Coulter.  The topic of Lambrecht's conversation with Coutler was the possibility of reselling Dell's managed services.

21.  Lambrecht told Coulter that InCompass had been reselling Dell's equipment but would not push it over Hewlett-Packard's because of InCompass' concern that Dell would continue poaching its customers.  Lambrecht expressed his frustrations with Dell doing this in the past to InCompass and other VARs.  Coulter replied that he understood Lambrecht's concern and acknowledged that, historically, Dell had competed against InCompass and the channel rather than partner with them.  Coulter told Lambrecht that InCompass would not have to worry about poaching if InCompass were "in the new [PartnerDirect] program" and registered his prospect or client. Coulter said that Dell was recognizing that it needed to have an official "channel program" and work with VARs and MSPs instead of against them.

22.  Coulter and Lambrecht agreed that the majority of the VARs and MSPs at the conference were like InCompass and did not trust Dell at all.  It was quite evident that Greg Davis, Dell's Vice President and General Manager of Global Commercial Channel, was not welcomed as a speaker by his audience of hundreds of VARs and MSPs.

23.  Coulter told Lambrecht that Dell would provide and later did provide InCompass with "seed" units (*i.e.,* free servers and blade platforms worth $30-40,000") to "convince InCompass' engineering staff" that InCompass should install and resell more Dell products.

24. Lambrecht told Coulter he wanted to learn with whom he could speak inside of Dell regarding a business opportunity that promised to be of considerable value to Dell. Coulter connected Lambrecht with Davis and Davis introduced Lambrecht to Albert Esser, Dell's VP Data Center Infrastructure. Esser told Lambrecht that he and other Dell executives knew they needed something different and were very interested in InCompass' energy saving technology.

25. Initially, Esser told Lambrecht that he and other Dell executives were eager to meet with him in Minnesota, but he and Lambrecht decided it would be easier, logistically, for Lambrecht to meet with them in Austin inasmuch as Lambrecht was heading to Dallas to meet with some friends and peer group on March 13-14, 2008.

26. On March 12, 2008, Lambrecht met in Austin, Texas, with Esser, Reza Rooholamin, John Igoe, and a couple of others whose names he does not recall and discussed InCompass' energy saving technology in considerable detail over a period of two-three hours. In the first third of the meeting, the Dell executives essentially said that they did not believe that it was a good idea to recycle power on servers on a regular basis, to which Lambrecht replied that other server manufacturers did not seem to be concerned with that. In the second third of the meeting, the Dell executives started to realize the value of what Lambrecht's idea was and agreed it was a great idea. In the last third of the meeting, the Dell executives started to say that it was something that they could accomplish and then asserted that they were already doing it. Esser reminded everyone in the room of the NDA and then excused the Dell executives from the room. Lambrecht was not immediately told that InCompass did not have any ideas or technology that did not already exist in the marketplace. Esser and Lambrecht decided to part ways for the time being and reconnect after Lambrecht got back to the

Minnesota.

27. Esser and Lambrecht communicated for about three weeks thereafter, and Esser subsequently admitted that Dell did not know for sure if the same technology existed in the IT marketplace. About three months later, Dell's website and the websites of divisions of Dell started to have language about saving energy with servers.

28. In February 2008, Coulter introduced Lambrecht to channel sales representative Cody Carder. Lambrecht told Carder that InCompass had been very successful selling tablet PC's into the medical community, and that InCompass had been using it as an entry point to gain sales on more expensive IT equipment such as servers and SAN units. Lambrecht told Carder that InCompass had built a good relationship with a competitive vendor of Dell for the tablets and that the vendor was bringing InCompass into deals outside Minnesota. However, Lambrecht said that he appreciated the "seed" units provided by Dell, so he thought he would give Dell a try.

29 Lambrecht told Carder that InCompass had approval to sell 200 tablet PCs to a long-standing healthcare clients' division and explained that the opportunity was significantly larger than the tablets as InCompass had this client for over four years and had met with all the major committees to define their IT strategies. InCompass knew that the long-standing healthcare client did not have Dell servers or SAN units and that it was an opportunity for Dell because the client was open to demonstrations and discussions. Carder told Lambrecht that he could give Lambrecht "special pricing" but only if Lambrecht gave him InCompass' confidential client contact information. Lambrecht told Carder that he did not feel comfortable doing so because of the concern that Dell's direct sales team would poach InCompass' client base.

Lambrecht let Carder know that he felt it happened in the past and had heard it happened to other MSPs and VARs.  Lambrecht told Carder that, after 20 some years of Dell selling direct, he did not feel Dell's culture would change overnight and he worried about a rogue Dell direct sales person.  Carder reassured Lambrecht that nobody from Dell's direct sales team would receive information about InCompass' clients.  Carder said that InCompass' accounts would be protected from the Dell direct sales team, and that Lambrecht did not need to worry about a specific "deal" registration.

30.  In March 2008, Lambrecht specifically designated the long-standing healthcare client deal as confidential to Carder in accordance with § 1(a) of the NDA.

31.  Lambrecht told Carder how InCompass developed tablet sales within its long-standing healthcare client as well as what divisions were purchasing them and who were the decision makers.  Carder spent weeks doing research within Dell.  He found that the account was large, over 6,000 users, but first reported that Dell did not have a dedicated onsite sales rep, so they wanted InCompass to represent all sales, including the PC sales.  Lambrecht told Carder that InCompass would be able to handle that.  Lambrecht also informed Carder that the long-standing healthcare client with whom the tablet sale was pending was getting impatient and that it was critical that the promised special pricing be provided.

32.  A couple of weeks later Carder called Lambrecht with contradictory news.  Carder reported that Dell did have a dedicated direct sales representative that was local in Minneapolis, but the account was too large and she had not been able to sell anything but PCs and printers.  Her name was Kerri Kolstad.  Carder said that Dell management approved InCompasss' deal registration and that InCompass would be

protected on selling the tablets.  Lambrecht let Carder know that he was now very concerned that a direct sales representative like Kolstad might use the confidential information provided to Carder to connect with InCompass' contacts and better understand how the tablet sales process allowed previously unattainable sales to be generated.  Carder reassured Lambrecht that no such thing would happen because management was involved and would make sure everything went fine.  Lambrecht requested an immediate meeting with Kolstad to be sure that there were no errors in communications and that she did not talk with the long-standing healthcare client about any of InCompass' initiatives as Lambrecht feared it would harm InCompass if it was miscommunicated to the long-standing healthcare client and its hardware vendor. Carder called or e-mailed Lambrecht weekly for a month or so giving him updates and asking him to hold off on selling the other vendor's products as Carder felt a meeting with Kolstad was going to happen soon.  He insisted that everything was ok and everyone was "onboard", but it was just difficult nailing down Kolstad's time on a calendar.  Carder was able to persuade Lambrecht to wait as the partnership between InCompass and Dell on the account would be very valuable to Dell.

33. About two months after InCompass' registration of the deal to sell about 200 tablet computers, Dell's direct sales representative Kolstad finally provided Carder with a time to talk on the phone.  Carder had told Lambrecht that there were some "challenges" but they were ready to move forward.  Lambrecht told Carder that he was confused as he thought everything was fine but that he was excited to finally move forward as the client was unhappy with InCompass for withholding the order.  The conversation between Carder, Kolstand and Lambrecht was recorded.  During the conversation, Kolstad stated that she did not agree with Dell's new partner program,

and that she did not need to work with InCompass. Carder and Kolstad got into an argument about InCompass' approval for the deal. Kolstad stated that she did not care if it got approved, because she felt Lambrecht took "liberties" with registering it. Kolstad went on to say that she and Lambrecht did not need to meet because she had already discussed things with the head of the purchasing department and other managers.

34. Kolstad poached the business tablet and all future IT deals by telling InCompass' long-standing healthcare client that InCompass was no longer reselling a competitive product from another vendor of InCompass, which was false, and instead was reselling Dell. Kolstad told them that InCompass was now reselling Dell but that it would be more efficient and less costly to deal directly through her for all products and that it was no longer necessary to purchase anything from InCompass.

35. Both Carder and Lambrecht were shocked at this news, and Lambrecht told Kolstad that it was not acceptable to have conversations about his business with his client. Kolstad stated that she would be happy to work with InCompass on certain accounts, but she would decide which ones she would sell directly to. Carder stated that what she was saying was unacceptable and that he would bring in management to straighten things out.

36. InCompass' long-standing healthcare client as a result cancelled its existing contract to buy about 200 tablet computers from InCompass. The delay with the order and the confusion caused by Kolstad frustrated that client and eventually caused it to cease doing business with InCompass altogether. In turn and upon learning that their common client had been told that InCompass was no longer reselling the vendor, InCompass' primary vendor and manufacturer of the original tablet orders cancelled its

reseller contract with InCompass and no longer gave InCompass leads, funds or support.

37.  Carder acknowledged that what Kolstad did was wrong, even though the information used to poach the deal was  probably provided directly by Carder himself.

38.  Dell failed to maintain the confidentiality of InCompass' registered deal to sell about 200 Dell tablet computers by allowing direct sales representative Kolstad to learn of it or by expressly disclosing it to her from the channel sales side of Dell.

39.  About eight months after InCompass lost its long-standing healthcare client and the hardware vendor, Lambrecht learned that about a week after he registered his confidential client information with Carder, the long-standing healthcare client started to get e-mails and marketing propaganda from Dell's direct sales team for products and MSP services.

40.  In the early stages of the relationship with Dell, InCompass had registered proprietary information regarding other clients only to learn that once deals were registered, the Dell sales team was contacting InCompass' clients directly to offer deals on hardware and even MSP services.

41.  Dell at all relevant times knew but never divulged that if a registered deal was not closed within an allotted 30 days, the direct sales team had full access to the confidential information and would poach the client.  Lambrecht has talked with many MSPs and VARs that register the deals under their own company name rather than disclose client information to protect their client base. The majority of Dells channel partners, however, are not aware of Dell's practices.

42.  In speaking to Lambrecht, channel sales manager Rick Theiler said the channel division and the direct sales team used the same system and same database

and it was his job to protect the VARs from the direct sales team.

43. Theiler told Lambrecht that ultimately the direct sales force used the registration data to poach the clients of channel resellers and that there was no way to stop it. He said that top level Dell executives knew that it should be account registration rather than deal registration but they would not change it because it had become a way for Dell to increase its direct sales.

44. According to Theiler, the many issues between the channel division and the direct sales team are not limited to commissions. The real problem is one of culture. Most of Dell's sales come from the direct teams. For Dell employees making direct sales, it is a matter of job security. That culture, which is next to impossible to change, is incompatible with a partner program.

45. When Lambrecht discussed the Kolstad situation with Theiler, Theiler stated, "yeah, yeah, so she is an idiot because she doesn't understand how the deal is really playing out like a lot of them." He went on to say " A lot of them [Dell direct sales representatives] are also concerned that the channel partners are going into their accounts and doing stuff that they've never been able to do directly themselves. It makes them look really stupid. So, I think some of them out there are trying to protect their jobs where it's easier for them to grab a registration or opportunity that somebody else is working on and lay claim to something that they created it or found it." Theiler also said "what normally happens is you have an opportunity you reach out to that team in healthcare at an account XYZ. They pump you for as much information as they can get on it and now they're in a position to go out there and effectively trying to compete with you on it in some of the same places."

46. Lambrecht told Theiler that he vented to Davis about the problems with a

deal registration process versus an account registration process. He said that Davis seemed open to it, to which Theiler replied, " I'm telling you, if I were to tell you that this is the process Greg Davis and Jim Dafoe and everyone wants us to work through, I think that they would say that that is the end state of what we want, but, you know, their belief still is that it is an opportunity-based [deal registration] system."

47. Theiler told Lambrecht that ultimately the Dell direct sales force has access to everything registered by channel partners.

48. Lambrecht described to Davis the damages that Kolstad's actions caused and how InCompass would need to lay off staff if the damages that were caused were not fixed or replaced within a few months. Davis agreed that Kolstad's actions were inappropriate and apologized to Lambrecht and stated that the partner program was new and they were having some challenges with their direct sales team members accepting the partnership with the VARs.

49. Lambrecht also had a discussion about the incident with Jim Defoe, Dell's AVP Americas Channels Group. Defoe told Lambrecht that what Kolstad had done to InCompass was "in violation in several things from a Dell standpoint" especially since InCompass "had a valid registration." Defoe apologized and stated that Dell "had a little bit of bad behavior by a Direct AE [Kolstad]" and that "she just doesn't understand the program, and we're [Dell] going to educate her on the program". Lambrecht asked Defoe how something like this could even happen, and Defoe commented that "unfortunately some of these things happen at the beginning of a program like this [New Partner Program]". Defoe told Lambrecht that it was unacceptable and InCompass would "have my [Dells] commitment to get it fixed."

50. Lambrecht was told that there was a major issue of Dell direct sales reps

refusing to accept the program. This was confirmed in many conversations Lambrecht had with many other Dell executives, managers and employees as well as many other VARs and MSPs across the country.

51. Davis said that they were thinking about restructuring the pay for the direct sales team so they would get the same commission whether they were to sell directly or through a channel partner. Davis felt that doing so would eliminate the direct sales representatives' competition mentality. "I am very focused on changing Dell's culture," Davis has said. "That's simple in theory, but hard in practice. I do not have a company that has channel DNA. We have direct DNA." Lambrecht told Davis that he was never told specifically that Dell worked with "deal registration" versus "account registration" and that it was a very bad idea to have an MSP register a simple PC and not realize that the direct sales team could and would poach the account for product and MSP business. Davis said that he had considered account registration, but it was a complex situation. He felt that the commission restructuring would solve the issue.

52. Davis said that he felt bad about the incident and that Dell would help InCompass grow its business through partnering on many other initiatives as he knew InCompass had other proprietary knowledge. He told Lambrecht that Dell could not replace the damages financially because Dell was not doing well with the bad economy and they were laying off employees.

53. Davis and Defoe connected Lambrecht to Dell's Regional Healthcare Sales Manager Bridget Winders, who was Kolstad's boss. During the first phone conversation, Winders apologized to Lambrecht regarding the actions of her employee. She told Lambrecht that she was aware of Kolstad's attitude toward the

partner program prior to Lambrecht submitting his "deal" registration. Winders admitted to Lambrecht that Kolstad's actions could have been prevented as she stated "Did I see that she [Kolstad] was challenging, you know, working with you, or any reseller frankly. Um. Yup. Yup I did." Winders agreed that Kolstad harmed InCompass by stating "Did she handle it poorly? For sure. Yes." Winders told Lambrecht that he was not the only partner this has happened to, and that "Most of our [Dell's] Folks aren't channel people right. We're a direct company by and large at least that's what we tell the world." Winders, as Davis did, apologized for the incident and promised to "replace" the lost business to InCompass by partnering with InCompass on healthcare deals. Davis asked her to fly into Minnesota as soon as possible so she could help her staff close a healthcare deal that Lambrecht would be able to run under InCompass to replace the lost revenue.

54. Over the next eight months, no such business was replaced, and InCompass had to make adjustments with staff and its business to survive the damages from the lost client and vendor.

55. After waiting about eight months, Lambrecht communicated with Michael Dell and was contacted by Davis who said "Michael asked that I get with you ASAP." Davis tried to help InCompass with other business initiatives such as including InCompass to be Dell's back-end Cloud hosting facility for healthcare and SMB or an Equal Logic demo center.

56. As disclosed under the NDA, Davis knew about InCompass' experience and ability to host virtual full desktops and healthcare applications both directly to end-users as well as InCompass' plan to allow other MSPs and VARs to resell InCompass' hosting services.

57. Davis, under the NDA, connected Lambrecht to Joachim Ackermann, Dell Vice President – Strategy and Business Development in India to discuss InCompass' confidential expertise and strategy to be the backend infrastructure for Dell and Lambrechts idea that could help Dell expand its revenue source by getting into Cloud managed services, and how InCompass has been providing these services in the US market and could be Dell's backend infrastructure for the Cloud in healthcare for Winders team and for the SMB market.

58. Lambrecht shared his expertise and understanding of what the U. S. market was going to be for SMB (small to medium sized businesses) and healthcare hosting.

59. Lambrecht explained the opportunity that there is within the channel.

60. Ackermann said he was impressed with Lambrecht's knowledge and asked him how InCompass was doing this currently and what the strategy was in the future and "this could really help our Cloud adoption." He said he appreciated all the insight and that he would contact Lambrecht in three months to move the discussion forwardas it was a little early for Dell to implement hosting services. Six months later, Dell acquired Perot Systems to accomplish everything Lambrecht disclosed to Ackermann.

61. Frustrated that Dell would not help InCompass replace the damages caused by Kolstad or by replacing the business, Lambrecht asked Davis to consider helping InCompass save nonprofits from going out of business by building an inexpensive hosting environment specific to nonprofits. Lambrecht suggested that Dell donate to a large non-profit equipment equivalent to the damages, and InCompass would maintain the system for the nonprofits. Dell declined to do that or any other partnering with InCompass and eventually discontinued all communications in late 2009.

## CAUSES OF ACTION

### Count 1
### Breach of Non-Disclosure Agreement

62.  InCompass repeats and realleges the allegations set forth in the foregoing paragraphs as if fully set forth herein.

63.  InCompass and Dell entered into a valid and enforceable NDA, under which the parties mutually agreed (a) to maintain the confidentiality of information shared between the parties; (b) to not disclose any such information to anyone except the parties' employees, agents, and consultants on a need-to-know basis (and only after such employees, agents, and consultants had been informed of and acknowledged their obligation to be bound by the terms of the NDA); and (c) to not use such information for any purpose other than that for which it is disclosed.

64.  The NDA further provided that all confidential information that was disclosed would remain the sole property of the party disclosing it and the receiving party would have no right, title, or interest in or to the confidential information.

65.  The NDA was supported by consideration in the form of mutual promises, assurances, and obligations set forth in the NDA.

66.  InCompass has performed all of the obligations required on its part in accordance with the terms and conditions of the NDA.

67.  Dell breached the terms of the NDA by, among other things, (a) failing to maintain the confidentiality of the information shared between the parties; (b) disclosing the information to Dell's employees, agents, and third parties who did not need to receive the information and/or who were not informed of and did not acknowledge their obligation to be bound by the terms of the NDA; (c) using the

information for purposes other than that for which it was disclosed, including but not limited to, using the information to poach InCompass' clients; and/or (d) profiting from the use of the information without adequately compensating Incompass as the owner of the information.

68. On information and belief, Dell substantially and materially breached the NDA by misappropriating and misusing the InCompass Technology and confidential and proprietary information to the benefit of Dell.

69. Dell failed to maintain the confidentiality of InCompass' registered "Deal" to sell about 200 Dell tablet computers to a long-standing healthcare client by allowing direct sales representative Kerri Kolstad to learn of it or by expressly disclosing it to her from the channel sales side of Dell.

70. Lambrecht had specifically designated the tablet computer deal as confidential to his Dell channel sales representative Cody Carder in accordance with § 1(a) of the NDA.

71. Dell's failure to protect InCompass' confidential and trade secret information and to allow such information to be distributed to others constitutes an intentional, willful, and malicious breach of the confidential relationship established by the NDA and entitles InCompass to full compensation including exemplary damages.

72. InCompass has been damaged and prejudiced by Dell's breach of the NDA in an amount to be determined at trial.

**Count II**

**Statutory Trade Secret Misappropriation**
**(Minn. Stat. § 325C.01 *et seq*)**

73. InCompass repeats and realleges the allegations set forth in the foregoing paragraphs as if fully set forth herein.

74. The InCompass Technology and confidential and proprietary information disclosed to Dell pursuant to the NDA comprised trade secrets owned by InCompass.

75. The InCompass Technology gave InCompass an advantage over its competitors, none of whom had access to the technology, and thus was a valuable and important part of InCompass' business.

76. Dell had a duty to maintain the confidentiality of the InCompass Technology and not disclose or use that technology and proprietary information about customers for its own use in any capacity whatsoever. Dell's duty arose pursuant to the terms of the NDA as well as pursuant to the circumstances under which InCompass was disclosing it, as Dell knew or should have known that the InCompass Technology and other confidential and proprietary information was disclosed to it in confidence and for a limited purpose.

77. InCompass has a legitimate business interest in maintaining the confidentiality of its trade secrets and proprietary information.

78. InCompass took reasonable and considerable efforts to maintain the confidentiality of its trade secrets and proprietary information, including requiring Dell to enter into the NDA.

79. Upon information and belief, Dell has used, disclosed, relied upon, and/or otherwise misappropriated trade secrets and confidential and proprietary information in violation of the Uniform Trade Secrets Act, Minn. Stat. § 325C.01 *et seq*

80. Losing the long-standing healthcare client "Deal" cost InCompass a considerable amount of sales revenue, and losing the long-standing healthcare client account thereafter has cost InCompass a considerable amount of annual revenue, as has the loss of the long-standing hardware vendor account.

81. Dell's unauthorized use and disclosure has damaged and continues to damage InCompass in an amount to be determined at trial.

## Count III
## Tortious Interference With Existing And Prospective Economic Relations

82. InCompass repeats and realleges the allegations set forth in the foregoing paragraphs as if fully set forth herein.

83. Prior to March 3, 2008, InCompass had existing business and contractual relationships with clients or customers.

84. Dell had knowledge of the existing business and contractual relationships between InCompass and its clients and vendors.

85. By way of its existing and successful business relationships, InCompass had and has a legitimate expectation of continued business opportunities with its clients.

86. InCompass also had and has a legitimate expectation that Dell not interfere with InCompass' prospective business advantage with other potential clients by using company contacts and other confidential product and customer information.

87. Dell has engaged in wrongful acts which include, but are not limited to, intentionally and wrongfully contacting or meeting with existing customers of InCompass to solicit business using InCompass' confidential and proprietary information with the direct result that two very large accounts, the long-standing healthcare client account and the long-standing hardware vendor account, were persuaded to cancel pending orders and cease doing business with InCompass altogether.

88. Dell's tortious interference has damaged and continues to damage InCompass in an amount to be determined at trial.

## Count IV
### Conversion

89.  InCompass repeats and realleges the allegations set forth in the foregoing paragraphs as if fully set forth herein.

90.  InCompass owns a proprietary interest in data regarding its customers, including but not limited to customer lists, customer revenue data, and customer preferences.

91.  On information and belief, Dell has retained certain property belonging to InCompass, including but not limited to proprietary customer information.

92.  Despite having no right to do so, Dell has taken InCompass' property and converted it to its own use, thereby depriving InCompass of its property and the value of such property.

93.  Dell's conversion has damaged and continues to damage InCompass in an amount to be determined at trial.

## Count V
### Unfair Competition

94.  InCompass repeats and realleges the allegations set forth in the foregoing paragraphs as if fully set forth herein.

95.  The InCompass Technology was created through the investment of extensive thought, time, labor, skill, and/or money by InCompass.

96.  On information and belief, Dell appropriated and used the InCompass Technology at little or no cost to it and has thereby obtained a special and unfair advantage in competition with InCompass as it awaits approval of it pending patent application covering the InCompass Technology.

97. Dell's appropriation and use of the InCompass Technology was without the authorization or consent of InCompass and with the knowledge that InCompass had applied for a patent to cover the InCompass Technology.

98. The conduct, practices, and activities of Dell, as described herein, constituted unfair competition that borders on the criminal. Specifically, suckering MSPs to "partner" with Dell in the selling of Dell's hardware has enabled Dell to obtain and then use their supposedly confidential client information to directly contact and persuade the clients of those MSPs to switch their monitoring business to Dell. Pitting Dell's direct sales force against such outgunned "partners" is unfair competition *per se*.

99. This behavior caused and will cause InCompass severe and serious injury, both by causing it to lose its advantage in the marketplace and by damaging its goodwill and reputation, for which InCompass should be compensated in an amount to be determined at trial.

## COUNT VI
## Unjust Enrichment

100. InCompass repeats and realleges the allegations set forth in the foregoing paragraphs as if fully set forth herein.

101. Pursuant to the NDA and the parties' relationship, Dell agreed to keep the InCompass Technology in confidence and further agreed not to use the InCompass Technology for its own advantage without InCompass' consent.

102. In reliance on the promises made by Dell in the NDA and to InCompass' CEO personally, InCompass disclosed the InCompass Technology to Dell in confidence, which allowed informal discussions regarding the sale or license of the

InCompass Technology to Dell.

103. Disclosure of the InCompass Technology to Dell created a special trust or fiduciary relationship between InCompass and Dell regarding the InCompass Technology.

104. Dell made use of the InCompass Technology for its own advantage.

105. Dell's use of the InCompass Technology for its own advantage was a breach of the special trust or fiduciary relationship that had arisen between Dell and InCompass.

106. Dell received the benefit of its use of the InCompass Technology, including revenues received from Dell's sales of products and services incorporating the InCompass Technology.

107. Dell has been unjustly enriched by its acceptance and retention of the benefits of its use of the InCompass Technology.

108. The acceptance and retention of the benefits of the use of the InCompass Technology by Dell has been at the expense of InCompass, which is entitled to those benefits.

109. The benefits received by Dell resulting from its use of the InCompass Technology and InCompass' confidential and proprietary information are held in a constructive trust for InCompass' benefit, which benefits are now due to InCompass.

110. For the foregoing reasons, InCompass is entitled to damages in an amount to be determined at trial.

## JURY DEMAND

111. InCompass demands a jury trial on all issues in this case which are triable to a jury.

## PRAYER

WHEREFORE, plaintiff InCompass IT, Inc., prays as follows:

1.   That defendant pay to InCompass all compensatory damages owed to InCompass up through entry of final judgment, including but not limited to all of the lost profits attributable to the misdeeds of defendant set forth in Counts I-VI;

2.   That defendant pay to InCompass an amount to be determined covering InCompass' actual damages, including but not limited to its lost profits plus interest;

3.   That defendant pay to InCompass an amount to be determined covering InCompass' incidental damages, including but not limited to the injury suffered to InCompass' goodwill plus interest;

4.   That defendant pay to InCompass exemplary and punitive damages in an amount to be determined at trial.

5.   That a constructive trust be imposed against defendant for all revenues collected from its sales of products embodying the InCompass Technology and/or resulting from the unauthorized use of InCompass' confidential and proprietary information by defendant; and

6.   That InCompass be awarded attorney's fees and such other and further relief as this court may deem just and equitable.

STANBURY LAW FIRM P.A.

Dated: March 11, 2011.

Alfred Stanbury
Minnesota A.I.N. 190457
2209 St. Anthony Parkway
Minneapolis, MN 55418
(612) 789-5060
FAX (612) 706-8743
amstanbury@earthlink.net
ATTORNEY FOR PLAINTIFF